UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TYRONE WILLIAM,<br><br>      Petitioner,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>      Respondent. | )<br>)<br>)<br>)<br>)  **Criminal Action No.**<br>)  **03-40024-FDS**<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER ON**
**PETITION FOR WRIT OF HABEAS CORPUS**

**SAYLOR, J.**

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Petitioner Tyrone William seeks habeas relief on grounds that he received ineffective assistance of counsel because his counsel (1) failed to conduct a pre-trial investigation into a potential alibi and to present such evidence as a defense; (2) failed to investigate and interview a key witness; (3) failed to object to the prosecutor's alleged vouching for a key witness; and (4) failed to object to the fact that he was sentenced for crack, rather than powder, cocaine. For the reasons set forth below, the petition will be denied.

**I.**  **Background**

In June 2003, a drug task force in Worcester, Massachusetts, conducted electronic surveillance over petitioner's cellular phone for conversations relating to drug trafficking and related offenses. Although somewhat cryptic, the conversations that the government offered at trial indicated that petitioner was supplying Fredine Jean-Baptiste with crack cocaine.

On July 3, 2003, agents searched Jean-Baptiste's apartment pursuant to a warrant. Agents found approximately 20 grams of crack cocaine packaged for distribution, packaging paraphernalia, and thousands of dollars in cash.

On July 15, 2003, Jean-Baptiste went to the Drug Enforcement Administration's offices to discuss the ownership of the drugs found in her apartment. While there, she explained that in November 2002, police had raided her house and recovered a gun and crack cocaine from her son's bedroom. Her son was detained during the subsequent state prosecution.

After her son's arrest, Jean-Baptiste began answering his telephone. In approximately January 2003, petitioner called the telephone looking for Jean-Baptiste's son. When Jean-Baptiste asked her son who petitioner was, he told her that petitioner was the supplier of the crack cocaine found in his room and that he owed him $3,000.

The next time that petitioner called, Jean-Baptiste arranged a meeting. At that meeting Jean-Baptiste suggested that petitioner should supply her with crack so that she could sell it and apply the profits to her son's debt. Petitioner agreed, and supplied Jean-Baptiste with approximately eight quarter ounces of crack, beginning in approximately March 2003 and continuing through June 2003. Jean-Baptiste estimated that there were about eight to ten such deliveries.

According to Jean-Baptiste, after the July 3 search of her apartment, petitioner came to her home looking for his money. Jean-Baptiste explained that she could not pay him because the cash and cocaine had been confiscated by the authorities during a search of her apartment, and showed petitioner the warrant as proof. Petitioner physically examined the warrant and left. Jean-Baptiste later turned over the search warrant that petitioner had handled, and a latent

fingerprint (ultimately identified to be the petitioner's) was recovered from it.

On September 10, 2003, petitioner was indicted and charged with conspiring to distribute more than 50 grams of cocaine base in the form of crack cocaine in violation of 21 U.S.C. § 846. The trial began on May 23, 2005. Jean-Baptiste testified at the trial pursuant to a plea and cooperation agreement.[1] Her testimony was largely consistent with the preceding facts.

On May 31, 2005, a jury convicted petitioner of conspiracy to distribute 50 grams or more of cocaine base in the form of crack cocaine. Because petitioner had been previously convicted of a narcotics felony, he faced a mandatory minimum sentence of 20 years' incarceration. On January 27, 2006, this Court sentenced petitioner to the statutory minimum of 240 months in prison and 10 years' supervised release. Petitioner appealed. On August 1, 2007, the United States Court of Appeals for the First Circuit affirmed the conviction and sentence.

## II.   Analysis

### A.   Standard of Review

Under 28 U.S.C. § 2255, a prisoner may file a motion to vacate, set aside, or correct a sentence. The relief may be granted on the grounds that the "petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998); *see also Hill v. United States*, 368 U.S. 424, 426-27 (construing the statute).

---

[1] Jean-Baptiste had signed a prior agreement that gave her immunity for selling crack supplied by petitioner. However, Jean-Baptiste breached that agreement when she was arrested for possessing crack with intent to distribute in March 2005. Thus, the government charged her with conspiracy to distribute crack, based on her conduct in 2003, and Jean-Baptiste entered into a new plea and cooperation agreement, under which she testified at petitioner's trial.

### B. Timeliness of the Petition

As an initial matter, the petition is subject to dismissal as untimely. Section 2255 establishes a one-year period of limitation for the filing of a motion. 28 U.S.C. § 2255(f). The period of limitation begins to run from the date on which the judgment of conviction becomes final. *Id.* at § 2255(f)(1). Where, as here, a conviction is affirmed on direct appeal, and the defendant does not file a petition for a writ of certiorari, the judgment of conviction becomes final when the time expires for filing such a petition—90 days after entry of the judgment of the Court of Appeals. *See Clay v. United States*, 537 U.S. 522 (2003). Here, the judgment of the Court of Appeals was entered on August 1, 2007. Thus, the judgment became final on October 31, 2007, and petitioner's filing on November 7, 2008, is time-barred.

### C. The Merits of the Petition

#### 1. Ineffective Assistance of Counsel Generally

In any event, the claim that the petitioner received ineffective assistance of counsel does not stand up to scrutiny. In order to establish that he received ineffective assistance, petitioner must first show that the "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Petitioner must also show "that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* The level of scrutiny must be "highly deferential." *Id.* at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable."). For the reasons set forth below, petitioner cannot meet the requirements of *Strickland*.

### 2. Failure to Investigate or Present Petitioner's Alibi

Petitioner asserts that he could not have sold drugs to a confidential informant in Worcester during the month of April 2003 because he was in fact in Cleveland, Ohio, during that time. He further contends that, although he alerted his attorney to this potential alibi defense, his attorney failed to research the matter or present any evidence of it during trial. Petitioner argues that such an oversight amounted to a violation of his Sixth Amendment right to counsel. (Pet. Mot. at 3).

The Court will assume, for present purposes, that petitioner could have produced credible evidence to show that he was in Cleveland during April 2003. It nonetheless appears that petitioner has exaggerated the significance of this evidence and the impact it would have had at trial. First, the conspiracy charged in the indictment was not limited to the month of April, but rather broadly spanned the period from "in or about March 2003 . . . until on or about July 23, 2003." The government did not need to prove precise dates, but rather was able to meet its burden by establishing that the conspiracy occurred in or about the period alleged. (Tr. 5-81). Therefore, even had petitioner's alibi for the month of April been admitted into evidence, it would not have been sufficient to establish an alibi for the entire time period, or even half of the relevant time.

Furthermore, and in any event, such a claim is contrary to the great weight of the

evidence.[2]  There is simply no reason to believe that the evidence concerning petitioner's presence in Ohio during the month of April would have negated the substantial evidence that proved petitioner's involvement in the conspiracy.  Moreover, Jean-Baptiste testified that she was not certain of exact dates on which petitioner delivered crack cocaine for her to sell.[3]

Finally, petitioner has also failed to suggest that his absence from Massachusetts in April 2003 would have prevented him from continuing his participation in the conspiracy during that time period.  For example, petitioner clearly could have remained in contact with Jean-Baptiste or others by telephone, or delegated delivery of the cocaine and collection of the profits to an accomplice.[4]  The alleged failure of counsel to raise an alibi defense therefore cannot meet the standard of *Strickland*.

### 3. Failure to Investigate or Interview Jean-Baptiste

Petitioner's second claim is based on counsel's alleged failure to investigate or interview his former accomplice and the prosecution's lead witness, Fredine Jean-Baptiste.  This claim is also without merit.

First, petitioner has provided no evidence to suggest that Jean-Baptiste would have consented to an interview, if one had been requested by defense counsel.  She could have easily

---

[2] The evidence at trial included intercepted communications from June 2003.  These conversations established that petitioner was regularly supplying "something" to Jean-Baptiste, that this product was packed in "a bunch" or "one," was generating substantial sums of cash, and caused petitioner to be concerned about attention from police. (Tr. 5-81).  The evidence also included a search warrant with petitioner's fingerprint on it, proving that he went to Jean-Baptiste's apartment after it had been raided in July 2003 and handled the warrant.

[3] "Q. [D]id the defendant make regular deliveries of crack cocaine to you? A. Yes, sir.  Q. And would it be fair to say that generally, not exactly, you don't recall exactly when or how much he delivered on each occasion, but that this occurred?  A. Yes, sir.  Q. And until what point did the defendant continue to deliver crack cocaine to you? A. Until the end of June." (Tr. 3-38.)

[4] Jean-Baptiste testified to that effect:  "Q. Did anyone else ever deliver crack cocaine to you that you had ordered from the defendant?  A. Yes, sir.  Q. On how many occasions did that happen?  A. Twice." (Tr. 3-43.)

denied counsel's request, had there been one. Moreover, Jean-Baptiste—who was herself a defendant charged with a serious offense—was represented by counsel during the relevant period. There is no evidence to suggest that Jean-Baptiste's counsel would have advised her to consent to such an interview with defense counsel, from which Jean-Baptiste was likely to derive little benefit.

Furthermore, petitioner has failed to show what an interview with Jean-Baptiste would have accomplished, or what additional information defense counsel might have acquired as a result. Among other things, the government voluntarily provided the defense with a series of disclosures that included a written statement of Jean-Baptiste, reports of interviews with her, and impeachment material—including the original immunity agreement, evidence of Jean-Baptiste's breach of the agreement, the information charging her with a drug felony, and her cooperation agreement. The defense was also provided with both recordings and transcripts of intercepted drug-related conversations between Jean-Baptiste and petitioner. These disclosures satisfied the Confrontation Clause guarantees for an opportunity to effectively cross-examine Jean-Baptiste. *See Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) *quoting Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("The Confrontation Clause guarantees . . . 'an *opportunity* for effective cross-examination, not cross-examination in whatever way and to whatever extent the defense may wish.'"); *accord Delaware v. Van Arsdell*, 475 U.S. 673, 679 (1986). Therefore, the question is whether the jury was in possession of sufficient facts to make a "discriminating appraisal" of the particular witness's motivation to testify falsely. *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1990).

In light of the information willingly provided to the defense, and the unfettered

opportunity to thoroughly cross-examine Jean-Baptiste for bias, inconsistencies, and motivations, petitioner cannot show, nor does he attempt to identify in his motion, what information his attorney would have learned from an interview that would have likely changed the outcome of the case. *See Strickland*, 466 U.S. at 687.[5]

### 4. Failure to Object to Prosecution's Alleged Vouching for his Witness

Petitioner next claims that his counsel was ineffective because she failed to object to the government's allegedly improper use of Jean-Baptiste's plea agreement to suggest that she had an obligation and incentive to testify truthfully. Specifically, petitioner contends that his counsel should have objected to, or moved to exclude, (1) testimony the government elicited from Jean-Baptiste about the terms of her plea and cooperation agreement, and (2) the government's summation that referred to Jean-Baptiste's obligation under plea agreement to tell the truth.[6] The Court finds both of these claims to be without merit.

First, there was no error in the prosecution's examination of Jean-Baptiste about the terms of her plea agreement. Evidence of a witness's plea agreement is entirely admissible to dampen the effect of an anticipated attack on that witness's credibility. *See United States v. Dworken*, 855 F.2d 12, 30 (1st Cir. 1988). When defense counsel's strategy consists of attacking

---

[5] Petitioner fails to specifically identify any piece of information that his counsel might have gained from an interview with Jean-Baptiste that had the potential to change the ultimate outcome of the case. Rather, he speculates that his attorney "might have learned that Miss Jean-Baptiste was about to testif[y] falsely regarding the relationship between [petitioner] and her son, Freddy." (Pet. at 8.) Such a speculative and undeveloped claim fails to carry petitioner's burden for a hearing. *See David v. United States*, 134 F.3d 470, 478 (1st Cir. 1998) (to warrant habeas relief, a petitioner must do more than "proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings.").

[6] Petitioner actually contends in his motion that the government improperly admitted Jean-Baptiste's plea and cooperation agreement (the second agreement) into evidence. However, this is inaccurate—the agreement was never offered or admitted into evidence. Rather, the government elicited the terms of the agreement through its direct examination of Jean-Baptiste. (Tr. 3-34 to 3-26.) Therefore, the court will treat petitioner's claim as alleging improper use of the terms of the agreement.

a government witness's credibility, a plea agreement is properly elicited on direct examination to counteract the anticipated attack. *United States v. Tse*, 135 F.3d 200, 207 (1st Cir. 1998). Here, defense counsel did, in fact, attack Jean-Baptiste's credibility in his opening statement and upon cross-examination.[7] By suggesting that her testimony was fabricated to obtain leniency, the defense invited an examination of the agreement. *See Tse*, 135 F.3d at 207; *see also United States v. Cosentino*, 844 F.2d 30, 34 (2d Cir. 1988) (holding that the written text of a cooperation agreement was properly admitted during the government witness's direct testimony after defense attacked witness' credibility during his opening argument, which made the entire agreement admissible). Once the details of a plea agreement have been properly admitted, a prosecutor may discuss them during closing arguments and comment upon the corresponding incentive for that witness to testify truthfully. *See United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991). Because prosecution's examination of Jean-Baptiste about the terms of her plea and cooperation agreement were lawful, petitioner cannot show that his counsel's failure to object fell below the constitutionally-required minimum.

Similarly, there was no error in the prosecution's closing arguments, which also referred to Jean-Baptiste's plea agreement and its effect on her incentive to tell the truth.[8] Although a prosecutor may not make personal assurances about a witness's credibility, an argument that does no more than assert reasons why a witness's testimony ought to be accepted as truthful by

---

[7] Defense's opening statement stated, "It takes a liar to lie, and that's why the star government witness in this case is Fredine Jean-Baptiste. . . . [S]he was willing to do whatever she could to save her skin . . . She decided to point the finger at Mr. William." (Tr. 2-25 and 2-27.)

[8] In its summation, the prosecution referenced Jean-Baptiste's incentive to tell the truth: "If [Jean-Baptiste] breaches [the plea agreement], if she should take the stand in any proceedings and lie or not tell the truth, by the time she gets out of jail her 4-year-old daughter is going to be in high school." (Tr. 5-46 to 5-47.) and "[Jean-Baptiste is] saying the things she is because of her obligation, I submit to you, to tell the truth."

9

the jury does not constitute improper vouching. *See United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003); *United States v. Rodriguez*, 215 F.3d 110, 123 (1st Cir. 2000); *United States v. Bey*, 188 F.3d 1, 7 (1st Cir. 1999). Here, the government merely alerted the jury to the terms of the plea agreement that related to Jean-Baptiste's obligation to tell the truth. Such statements are not improper. *See Bey*, 188 F.3d at 7; *Dockray*, 943 F.2d at 156; *see also United States v. Millan*, 230 F.3d 431, 438 (1st Cir. 2000) (holding that prosecution's vouching was not improper where it referred to a key witness's agreement to testify honestly to support the contention that the witness had indeed told the truth and was worthy of the jury's belief). Because the prosecution's references to the plea agreement and its effect on Jean-Baptiste's incentive and obligation to tell the truth were lawful, petitioner cannot show that counsel's failure to object fell below any objective standard of reasonableness.

Moreover, even were the Court to assume that there was an error in either the testimony elicited about the plea agreement or the remarks made by prosecution during summation, petitioner offers no evidence to satisfy the second prong of the *Strickland* test—that an objection by counsel, in light of the weight of the other evidence stacked against him, would have created a reasonable probability of a different outcome.

### 5. Failure to Object to Sentencing for Crack Cocaine

Petitioner's fourth and final basis for his claim of inefficient assistance of counsel rests on defense counsel's failure to object when he was sentenced based on conspiracy to distribute crack, rather than powder, cocaine.

Despite petitioner's argument to the contrary, both the verdict and the evidence upon which it was based support a sentence based on crack cocaine. First, the jury charge and verdict

form both expressly directed the jury to make a determination as to whether the cocaine base was in the form of crack cocaine.[9] In following this instruction, the jury found that petitioner conspired to distribute crack, and not powder, cocaine.

Furthermore, the evidence at trial was more than sufficient to support a verdict finding that the form of cocaine base was in fact crack cocaine. Jean-Baptiste testified that the substance petitioner supplied was "half of a regular ice cube . . . beige, off white." (Tr. 3-34 to 3-35.) Agent Budrow also testified that on July 3, 2003, he seized off-white and rocklike contraband from Jean-Baptiste's apartment, which, based on his training and experience, appeared to be crack cocaine. (Tr. 2-94.) Agent Boyle testified generally that the appearance of crack cocaine and the manner in which it was prepared was consistent with the substance recovered from Jean-Baptiste's apartment. (Tr. 2-37 to 2-38.) Finally, the chemist testified that the chemical analysis indicated that the cocaine base was in the form of crack cocaine. (Tr. 4-69 to 4-70.)[10] Therefore, the jury's verdict, as well as the strong evidentiary basis upon which it was based, provided a more than sufficient foundation for the sentence and, as a result, petitioner cannot establish

---

[9] The Court's charge instructed the jury as follows:

> The conspiracy crime that the defendant is charged with involves a specific kind of controlled substance: cocaine base in the form of crack cocaine. For the sake of simplicity, I will sometimes refer to that controlled substance as crack cocaine, but when I do that, I am referring to cocaine base in the form of crack cocaine. (Tr. 5-79.)

In addition, the Court instructed the jury as follows:

> If you find, beyond a reasonable doubt, that the defendant is guilty of the conspiracy charged in the indictment, you must also decide whether the government has proved, beyond a reasonable doubt, whether the amount of crack cocaine was 50 grams or more. (Tr. 5-85.)

[10] In particular, the chemist found the presence of sodium bicarbonate in the substance, which is ordinarily used in converting cocaine into crack cocaine. (Tr. 4-69 to 4-70.)

deficient performance by his counsel for failure to object to it.

### III. Conclusion

For the foregoing reasons, the petition of Tyrone William for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 is DENIED.

**So Ordered.**

                                            /s/ F. Dennis Saylor
                                            F. Dennis Saylor IV
                                            United States District Judge

Dated: October 23, 2009